William Keith CLARK *v.*
ARKANSAS DEPARTMENT of HUMAN SERVICES

CA 04-967

206 S.W.3d 899

Court of Appeals of Arkansas
Opinion delivered April 13, 2005

[Rehearing denied May 18, 2005.*]

---

* GLADWIN, J., would grant rehearing.

448

*Martha O. Carder,* for appellant.

*Gray Allen Turner,* and *Stasia Burk,* Attorney *Ad Litem,* for appellees.

WENDELL L. GRIFFEN, Judge. William Keith Clark appeals from an order adjudicating his two sons, G.C. and J.C., dependent-neglected. He argues that the trial court erred in not appointing counsel for him at the adjudication hearing. He also challenges the sufficiency of the evidence finding the children dependent-neglected. We hold that the trial court erred in failing to appoint appellant counsel prior to the adjudication hearing. Therefore, we reverse and remand.

The Arkansas Department of Human Services ("DHS") filed a petition for dependency-neglect on May 3, 2004, alleging physical abuse against G.C. and mental abuse against J.C.[1] As a result of the incident, Karen Clark (appellant's wife and G.C. and J.C.'s mother) agreed to a safety plan with DHS. Among other things, Mrs. Clark agreed to not allow appellant to be around the children during the pendency of the investigation.

Before the hearing, appellant asked the court to appoint him counsel; however, the trial judge's law clerk sent appellant and Mrs. Clark a letter stating that they did not qualify financially for a court-appointed attorney. When appellant arrived at the hearing without counsel, the following exchange occurred:

> COURT: And the Court will note for the record that, in this matter, Mr. Clark filled out an Affidavit of Indigency requesting an attorney, and the Court denied that based on the income that was presented to the Court and the fact that four people were living in his home.
>
> Subsequently, I think my law clerk had some contact with either him and/or mom, or either one, and indicated to mom that she needed to — if she wanted a court-appointed attorney, that she needed to indicate that she was unemployed but Mr. Clark was providing some financial support to the home. So mom did that, and the Court appointed Ms. Free to represent her.
>
> And Mr. Clark never asked to be considered for a court-appointed attorney after that.

---

[1] The affidavit attached to the complaint stated that J.C.'s hair was falling out because of mental stress. J.C.'s hair has been falling out since he was four years old due to alopecia. DHS unsubstantiated the finding of mental abuse; thus, it is not part of the basis for its request that the trial court find the children dependent-neglected.

Mr. Clark, have you sought the services of an attorney?
. . .

• • •

APPELLANT: I thought filling out the papers was the court-appointed attorney. I was denied that, as you have said, and I contacted an individual, and he has to have a $5,000 retainer fee and —

COURT: Contacted an attorney?

APPELLANT: Since then, yes.

COURT: You said "an individual." I just wanted to know if they were an attorney.

APPELLANT: Yes, ma'am, I'm sorry.

COURT: Who needed a $5,000 retainer?

APPELLANT: Yes. So I didn't proceed or pursue it.

COURT: At this point, are you able to separate how much money you're living on from the money that you are giving the family?

APPELLANT: Everything I'm making is going into the bank, and she's paying bills, and they're living on it. I'm just getting gas and what I have to have.

COURT: And where are you living, Mr. Clark?

APPELLANT: I'm living in Texas — east Texas.

COURT: If this matter proceeds, do you want the Court to take up the issue of whether you would be entitled to a court-appointed attorney based on your income, as best we can — as Jethro says — "cipher" it?

APPELLANT: I don't understand "if this Court proceeds."

COURT: If the petition is not dismissed today. I don't have a clue what's going to happen.

APPELLANT: Oh.

COURT: That's what I'm saying. If the petition is dismissed, of course, you wouldn't need one. If the Court proceeds and there is a finding of dependency/neglect, either after an agreement which is accepted by the Court or after an adjudication where I make that determination, that's what I meant "if we proceed."

APPELLANT: I understand.

COURT: Yes.

APPELLANT: Yes, ma'am.

COURT: And actually, then that may make a whole different thing. If all the money is going to her, then she may not be indigent. See, that doesn't make any sense either. That's not the information I had here. So if most of your money is going to her and the family, then they may not be indigent for your income, the bulk of it, based — because if I'm not mistaken, you bring home —

APPELLANT: Your Honor?

COURT: — $558 every week; right?

APPELLANT: I'm sorry?

COURT: That's what — $558 a week?

APPELLANT: Yes, ma'am.

COURT: And how much of that 558 a week goes to your wife?

APPELLANT: It all goes into the bank.

COURT: I know, but aren't you drawing some of it out? You have got to be getting money from somewhere if you are living in —

APPELLANT: Just, like I said, enough to get for gas and $20, $30 to make it through the week.

COURT: I got you.

APPELLANT: And everything else goes to pay bills, and not much left over when we do that.

COURT: Okay. So Mrs. Clark; is that right? You're getting the bulk of the money?

Ms. CLARK: Yes, ma'am. Well —

COURT: Well then, you're not indigent. I'm listening. Keep going.

Ms. CLARK: I have — he's a minister.

COURT: I understand that.

Ms. CLARK: And the church deacon just puts his check into the bank, and I write out the bills. He had been paying all the bills —

COURT: Right.

Ms. CLARK: — before he was removed from the home.

COURT: Right.

Ms. CLARK: But he still has access to withdraw some cash from the ATM where he is. He has done so. He took 100, and he took 50, and he's withdrawn the 50.

COURT: I got you.

Ms. CLARK: I'm not sure what the total is, but he hasn't taken a lot of money out of it, but —

• • •

Ms. CLARK: Your Honor, out of that money, I have been paying for him his truck payment, which is 339 a month.

COURT: Oh, I'm not talking about the —

Ms. CLARK: You didn't need to know that? Okay.

COURT: Hold on. No, I don't need to know that because everybody's got — not everybody — but most people have obligations. I look at the income that comes in, the net income, and the number of persons in the home based on that income. Everybody's got bills. Some people make a million dollars and spend two, so —

Ms. CLARK: Yes, ma'am.

COURT: Okay. Oh, goodness. So what I will do then is, I will — if this proceeds and I will appoint an attorney for dad, and then I'm going to reserve the right to order everybody or anybody to pay a reasonable amount of attorney's fees. If I do that, it may be partial, and it may just be a reasonable amount of money. So I will just do that.

Regarding the allegations stated in the petition for dependency-neglect, Lawrence Barron testified that DHS received a report alleging that appellant wrapped a belt around G.C.'s neck. Barron talked to G.C., who told him that on April 20, 2004, appellant left the house and told G.C. that if he wanted to go somewhere, he needed to call first. G.C. told appellant he was seventeen and did not need to call him or tell him anything. When appellant returned, G.C. was playing video games. Appellant told G.C. that he was glad that G.C. was there because "I would have had to put this belt on you." The two exchanged words, "one thing led to another," and appellant put the belt around G.C.'s neck. G.C. told Barron that while appellant pulled the belt tight around his neck, he did not cut off his airway. The belt left red marks around G.C.'s neck. In his investigation, Barron also checked with child protective services in Quitman, Texas, and discovered that appellant had a history of physical abuse with another son.

Appellant's version of the story did not substantially differ from Barron's. He testified that he went to the hospital to visit a member of his church who was dying. When he returned home, he saw G.C. playing video games and said that he was glad to see him there and that if he were not there, he might have to use a belt on him. Appellant said that he smiled and that G.C. smiled back. G.C. then said that he was seventeen and could leave whenever he

wanted. Appellant testified that the two were just playing and that at one point, he "just fell down on top of him with the belt and held him down against the love seat." He denied actually wrapping the belt around G.C.'s neck and stated that he was on G.C. for less than twenty seconds.

The trial court found both G.C. and J.C. dependent-neglected. It stated that even if appellant put the belt around G.C.'s neck in a non-hostile way — a contention it did not believe — his behavior was still inappropriate and caused marks that were still present three days after the incident occurred. The trial court found J.C. dependent-neglected based on the previous finding of abuse of an older sibling and because J.C was at the house when the incident with G.C. occurred.

After the adjudication, the trial court asked the parties whether it would be unreasonable for appellant to move back into the house to participate in DHS's services. The trial court heard further testimony from Mrs. Clark, who stated that she was afraid of appellant because he had abused her in the past and because he might abuse her or the children again. She also testified that G.C. and J.C. were satisfied with appellant being out of the home because it was more peaceful and less tense.

Appellant testified that he was the sole breadwinner of the house and that Ms. Clark had no job. However, his church was going to vote the following Wednesday on whether he could stay based on what happened at the hearing that day. Appellant also testified that his family was in Texas and that both his mother-in-law and father-in-law had been sick. Both J.C. and G.C. said that they wanted to see their father and that they could work that out.

In its order, the trial court stated its findings of dependency-neglect. The order also placed the children in Mrs. Clark's physical custody, provided supervised visitation for appellant (to be worked out between DHS and appellant), and allowed appellant to have phone and mail contact with J.C. and G.C. The trial court later appointed counsel for appellant.

### Appealability

■ Before addressing the merits of the appeal, we must address jurisdiction. Judge Gladwin would have us dismiss this appeal for lack of finality. While not addressed by either party, the question of whether an order is final and subject to appeal is a

jurisdictional issue that we may address *sua sponte. Moses v. Hanna Candle Co.*, 353 Ark. 101, 110 S.W.3d 725 (2003); *Foreman v. Arkansas Dep't of Human Servs.*, 78 Ark. App. 48, 82 S.W.3d 176 (2002). Rule 2(c) of the Rules of Appellate Procedure – Civil (2004) addresses the appealability of juvenile cases. The relevant portions read:

> (3) In juvenile cases where an out-of-home placement has been ordered, orders resulting from the hearings set below are final appealable orders:

> (A) adjudication and disposition hearings[.]

■ Judge Gladwin believes that the order finding G.C. and J.C. dependent-neglected is not a final order because out-of-home placement was not ordered for the juveniles. We disagree because the trial court's order was, in effect, an out-of-home placement. The children were allowed to stay in the home, but in enforcing the DHS safety plan the trial court barred appellant from staying with them. We hold that the trial court ordered an out-of-home placement for purposes of finality of the appeal under Ark. R. App. P. – Civ. 2(c). Therefore, the adjudication order in this case is a final order.

We must also address DHS's argument that appellant included inappropriate documents in the record. Specifically, DHS cites Ark. Sup. Ct. R. 3-1(n) (2004) for the proposition that the record is limited to pleadings, the judgment, the decree, the order appealed, the transcript, exhibits, and certificates. DHS identifies a letter to the parents, a letter to Mrs. Clark, summons and proof of service, a letter to the trial judge, an affidavit of indigency by Mrs. Clark, a one-page document labeled "affidavit of indigency" that is neither signed nor verified, an information sheet, and a letter from Mrs. Clark concerning her bills as documents that should be stricken from the record.

■ While Rule 3-1(n) has been cited to explain how a record was deficient in a case, *see Rodriguez v. Arkansas Dep't of Human Servs.*, 360 Ark. 180, 200 S.W.3d 431 (2004), we are unaware of any holding that materials not stated in Rule 3-1(n) should be stricken from the record. Many of these documents are relevant to appellant's argument that he is indigent. As such, they were properly included in the record.

## The Right to Counsel

Appellant argues that the trial court erred in denying him court-appointed representation at the adjudication hearing. He argues that "the right of indigent parents to appointed counsel in dependency-neglect cases is absolute in all proceedings to remove custody" and cites Ark. Code Ann. § 9-27-316(h) (Supp. 2003) for support. The statute requires, in relevant part:

(1) In all proceedings to remove custody from a parent or guardian or to terminate parental rights, the parent or guardian shall be advised in the dependency-neglect petition or the ex parte emergency order and the first appearance before the court of the right to be represented by counsel *at all stages of the proceedings* and the right to appointed counsel if indigent. (Emphasis added.)

(2) Upon request by a parent or guardian and a determination by the court of indigence, the court shall appoint counsel for the parent or guardian in all proceedings to remove custody or terminate parental rights of a juvenile.

We must determine whether an indigent parent involved in a dependency-neglect proceeding where removal is possible is entitled to counsel at the adjudication stage. Before answering this question, we must address other issues raised by DHS.

■ DHS first argues that the trial court correctly found that appellant was not indigent. A law clerk made the initial decision not to find appellant indigent before the hearing; the court decided to appoint counsel after the adjudication hearing. If appellant was not indigent, then he is not entitled to court-appointed counsel at *any* stage of the proceedings. *See Hill v. State*, 304 Ark. 348, 802 S.W.2d 144 (1991). We view the trial court's decision to eventually appoint counsel as its acknowledgement that appellant was indigent.

■ Next, DHS claims that appellant never explicitly requested counsel. This argument does not square with the record. In the colloquy quoted in the beginning of this opinion, the trial court clearly stated that appellant filed an affidavit of indigency requesting an attorney and that he was denied an attorney. We hold that the trial court's statement that appellant requested counsel, combined with the letter from the law clerk denying him counsel, indicates that appellant made a clear request to have

counsel appointed. Because we hold that appellant was indigent and that he requested that counsel be appointed, we now analyze whether he was entitled to counsel at the adjudication hearing.[2]

In *Lassiter v. Dep't of Social Servs.*, 452 U.S. 18 (1981), the United States Supreme Court evaluated an indigent parent's right to counsel in termination-of-parental-rights cases using the factors identified in *Mathews v. Eldridge*, 424 U.S. 319 (1976):

■■ To summarize the above discussion of the *Eldridge* factors: the parent's interest is an

> extremely important one (and may be supplemented by the dangers of criminal liability inherent in some termination proceedings); the State shares with the parent an interest in a correct decision, has a relatively weak pecuniary interest, and, in some but not all cases, has a possibly stronger interest in informal procedures; and the complexity of the proceeding and the incapacity of the uncounseled parent could be, but would not always be, great enough to make the risk of an erroneous deprivation of the parent's rights insupportably high.

*Lassiter*, 452 U.S. at 31. However, the Court held that the Constitution does not require the appointment of counsel in every parental-termination proceeding. The question of whether an indigent parent is entitled to counsel is a question for the trial court, subject to appellate review. *Id.* The right to counsel must be analyzed in light of two major factors: 1) whether or not the case presented any specially troublesome points of law, and 2) whether or not the presence of counsel could have made a determinative difference. *Id., cited in Battishill v. Arkansas Dep't of Human Servs.*, 78 Ark. App. 68, 82 S.W.3d 178 (2002).[3]

---

[2] DHS makes many other arguments; however, we address them as we analyze the indigent parent's right to counsel at the adjudication hearing.

[3] The United States Supreme Court further discussed the fundamental liberty interest of parenthood in *Santosky v. Kramer*, 455 U.S. 745, 753-54 (1982) (holding that due process demands clear and convincing proof of parental unfitness before terminating a parent's rights):

> Even when blood relationships are strained, parents retain a vital interest in preventing the irretrievable destruction of their family life. If anything, persons faced with forced dissolution of their parental rights have a more critical need for procedural protections than do those resisting state intervention into ongoing family affairs.

■ ■ The Arkansas Supreme Court has discussed the indigent parent's right to counsel as follows:

> Whether due process requires the appointment of counsel in a particular parental-termination proceeding is a matter for the trial court to determine, subject to appellate review. *Lassiter v. Department of Soc. Servs.*, 452 U.S. 18, 32, (1981). Although it may be wise public policy for the States to adopt higher standards of protection for parents in dependency-neglect and termination proceedings, the threshold requirement for state courts in determining whether to appoint counsel to indigent parents in termination proceedings is fundamental fairness. *Id.*, 452 U.S. at 33-34. Consequently, according to the Supreme Court, there is no absolute due process right to counsel in all parental-termination proceedings. *Id.* Rather, it is an issue that must be addressed on a case-by-case basis. *Id.* The State of Arkansas has chosen to allow the appointment of counsel for indigent parents in all parental-termination proceedings. [Ark. Code Ann. §] 9-27-316(h) (Supp.1999). However, this is a State-conferred statutory right. The due process right to counsel arises only if the circumstances of each particular case indicate that fundamental fairness requires the appointment of counsel.

*Bearden v. Arkansas Dep't of Human Servs.*, 344 Ark. 317, 324-25, 42 S.W.3d 397, 401-02 (2001), *quoted in Jefferson v. Arkansas Dep't of Human Servs.*, 356 Ark. 647, 158 S.W.3d 129 (2004). The Arkansas General Assembly has explicitly recognized an indigent parent's right to the appointment of counsel in all proceedings to remove custody from a parent or to terminate parental rights. *See* Ark. Code Ann. § 9-27-316(h) (Supp. 2003).

In *Briscoe v. State*, 323 Ark. 4, 912 S.W.2d 425 (1996), the appellant, mother of a ten-year-old child, was represented at the emergency custody hearing but counsel withdrew after a conflict arose between the parents. The trial court had several review hearings over a two-year period without appointing appellant an attorney, but it appointed counsel for her prior to the termination-of-parental-rights hearing. Our supreme court held that the trial court erred in allowing the review hearings to proceed without granting her request for appointed counsel, but held that the error

---

When the State moves to destroy weakened familial bonds, it must provide the parents with fundamentally fair procedures.

was harmless because the final termination hearing aired all of the evidence presented at the hearings leading up to the termination of parental rights.[4]

We hold that the trial court abused its discretion when it failed to appoint counsel for appellant. Because the children have been effectively taken away from him although they remained in the home, appellant has a right to counsel under Ark. Code Ann. § 9-27-316(h). As long as the DHS safety plan is enforced, appellant's home will not include his children. For the purposes of the statute, we discern no difference between having children removed from parental custody and ordering that a parent move from home in such a way that the parent cannot exercise custody. Under this statute, appellant should have been appointed counsel prior to the adjudication hearing.

Our holding is further supported by *Briscoe v. Arkansas Dep't of Human Servs., supra.* That case does not stand for the proposition that failure to appoint counsel is always harmless. Here, we are not analyzing the harm's effect on the entire process (which includes all subsequent review hearings and any potential termination-of-parental-rights proceedings). Rather, we are looking at the trial court's decision as it relates to the dependency-neglect adjudication alone. Having counsel present could have made a difference. Counsel could have cross-examined the witnesses. The dependency-neglect adjudication is the first step to termination of parental rights.[5] The DHS safety plan bars appellant from the house where his children live. The consequence of the adjudication is that appellant is now a registered child abuser. These factors plainly demonstrate the gravity of the issues presented during the

---

[4] We are also mindful of our supreme court's decision in *Jefferson v. Arkansas Dep't of Human Servs.*, 356 Ark. 647, 158 S.W.3d 129 (2004). There, the issue of whether the indigent appellant should have been appointed counsel at the dependency-neglect hearing was not adequately preserved, but the supreme court addressed it anyway. After reviewing the record, the supreme court held that the fundamental fairness of the termination-of-parental-rights proceedings was not jeopardized by the failure to provide legal representation at the adjudication hearing; however, in an exercise of caution, the supreme court did not consider any testimony given by the appellant at the dependency-neglect hearing.

[5] DHS argues that appellant is not at risk of permanently losing custody of his children. However, after the requisite period of time, DHS may opt to proceed with termination proceedings. That period of time started the day appellant moved from the home pursuant to the DHS safety plan. *See* Ark. Code Ann. § 9-27-341(b)(3)(B)(i)(*b*) (Supp. 2003); *Bearden v. Arkansas Dep't of Human Servs., supra.*

dependency-neglect proceeding and the harm posed by denying appellant's request for appointed counsel.

■■■ We hold that the trial court erred when it did not appoint appellant counsel prior to the adjudication hearing and that the error was not harmless. The order adjudicating G.C. and J.C. dependent-neglected is hereby reversed, and this case is remanded for further proceedings. Because we hold that the trial court erred in not appointing counsel for appellant, we do not reach the issue of whether the evidence was sufficient to support the dependency-neglect adjudication.

Reversed and remanded.

HART, VAUGHT, CRABTREE, and BAKER, JJ., agree.

GLADWIN, J., dissents.

ROBERT J. GLADWIN, Judge, dissenting. I dissent. Although I agree that the trial court erred in not appointing an attorney to appellant, I believe this case must be dismissed because the order that appellant appeals from is not a final appealable order. When ruling on matters of jurisdiction, we are obligated to resolve the issue on our own, regardless of whether the parties bring the issue to the court's attention and regardless of the parties' posture on the issue. *Timmons v. McCauley*, 71 Ark. App. 97, 27 S.W.3d 437 (2000).

Appeals in juvenile cases are made in the same time and manner provided for appeals from circuit court. Ark. R. App. P.–Civ. 2(c). In juvenile cases where an out-of-home placement has been ordered, orders resulting from adjudication and disposition hearings are final appealable orders. Ark. R. App. P.–Civ. 2(c)(3)(A). In this case, there has been no out-of-home placement ordered.

According to Ark. Code Ann. § 9-27-303(38)(A) (Supp. 2003), an "out-of-home placement" means:

(i) Placement in a home or facility other than placement in a youth services center, a detention facility, or *the home of a parent* or guardian of the juvenile; or

(ii) Placement in the home of an individual *other than a parent* or guardian, not including any placement where the court has ordered

> that the placement be made permanent and ordered that no further reunification services or six-month reviews are required.

[Emphasis added.]

Paragraph 4 of the June 25, 2004 order appealed from specifically states that "The boys will be in mom's physical custody and remain in her home." Paragraph 11 further provides that "The case plan goal will be to maintain the children in the home, and the Court does approve that goal." Also, although DHS's case plan was not incorporated into the court's order, its provisions were approved. On page 8 of the case plan under section VIII, the question is posed "Is the client in an out-of-home placement?" An "X" is placed next to the box marked "No," and the box entitled "Reason for Removal" is blank. Nowhere in the order are the children, or the father for that matter, specifically ordered to be removed from the home.

In this case, the majority has ostensibly held that any separation of a child from his or her parent is an out-of-home placement. I understand that this interpretation affords appellant his only opportunity of appellate review; however, the Arkansas Rules of Appellate Procedure require that an out-of-home placement be ordered before an order resulting from an adjudication and disposition hearing constitutes a final appealable order. I simply cannot ignore the "out-of-home placement" aspect of Rule 2(c)(3)(A).